Robert Allison **STEWART**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 19044.

United States Court of Appeals
Eighth Circuit.

May 22, 1968.

486

Martin D. Hill, Dubuque, Iowa, for appellant.

Steve Turner, Asst. U. S. Atty., Sioux City, Iowa, for appellee, Gene R. Krekel, Asst. U. S. Atty., on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

Robert Allison Stewart, hereinafter referred to as defendant, was convicted by trial to a jury for violation of 18 U.S.C. § 2312, commonly called the Dyer Act, for the transportation of a Cessna aircraft in interstate commerce from Sarasota, Florida to Dubuque, Iowa, knowing the same had been stolen.[1] The assignments of error on appeal—seven in all—involve the validity of the indictment by reason of an amendment thereto made by the court in correcting a clerical error in the date of the crime; the court's charge to the jury and its refusal to give certain of defendant's requested instructions; and the court's refusal to allow defendant to view the grand jury testimony.

Summarized briefly, the facts reveal that on June 20, 1967 defendant, using the name "Don Perry," made arrangements to rent an airplane from J&J Aircraft of Sarasota, Florida for use the following morning for the alleged purpose of flying to Key West, Florida to take some pictures with the agreement that he would return the plane to Sarasota by noon. He checked the plane out the next morning, June 21, 1967, and he and a friend, a Lieutenant Jacobson, flew instead to Birmingham, Alabama. He admitted at the trial that when he made arrangements to rent the plane he planned to go to Alabama and Texas and that it was never his intention to go to Key West, his explanation for this misrepresentation being that he and Lieutenant Jacobson were short of funds and would have been unable to advance the large deposit which he thought would be required for the out-of-state trip he actually intended and, further, he was afraid that the truth might result in a closer check of his credentials and disclose his past criminal record.

Stewart and Lieutenant Jacobson remained in Birmingham, Alabama from June 21 until June 27. On June 23, the president of J&J Aircraft received a telephone call from a person who said he was Don Perry and requested permission to keep the plane to make a three-day trip to Jacksonville. He was instructed to return the plane immediately—to have it back in Sarasota by noon that very day. It was not returned, however, and on June 27 the company received a call from a person who identified himself as a Mr. Worthman of New Orleans, who advised that Mr. Perry was flying from Tallahassee to Sarasota. The defendant did not go to Sarasota, but, by his own admission, flew from Birmingham to St. Louis, Missouri, then to Kansas City, Missouri, Council Bluffs, Iowa and Des Moines, Iowa, before his arrival in Dubuque, Iowa, where he was ultimately arrested on July 15, 1967. The jury did not accept defendant's explanation which was centered on his assertion that he always

1. 18 U.S.C. § 2312 provides:
"Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

intended to return the plane, and that his various trips around the country were for the purpose of borrowing money from friends or obtaining employment to pay for the plane rental upon his return. He used different aliases at different places and a credit card under another name for service, repairs, etc. for the plane.

*The Indictment.*

■ The original indictment charged the defendant with having committed the crime on or about July 21, 1967. The date of July 21, 1967 was clearly a typographical error, inasmuch as all of the evidence before the grand jury reflected commission of the crime on June 21, 1967, and, moreover, defendant was arrested on July 15, 1967, and from that time on was held in jail due to inability to make bond. The question for resolution is whether under these facts the trial court's action in correcting the date of the indictment in any way contravened the constitutional provisions concerning indictments which are contained in the Fifth and Sixth Amendments, or the settled federal rule prohibiting any change or amendment of a federal indictment unless the same is a matter of form. The amendment of a federal indictment always presents a serious issue by reason of the Fifth Amendment requirement of a presentment or indictment by a grand jury, and the Sixth Amendment requirement that an accused shall enjoy the right to be informed of the nature and cause of the accusation. Because of the constitutional provisions mentioned, it has become settled law in the federal courts that an indictment may not be amended except by resubmission to the grand jury unless the change is merely a matter of form. Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L. Ed.2d 252 (1960); and Russell v. United

States, 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

It was held in *Stirone* that a criminal charge may not be broadened except by the grand jury itself. In that case, Mr. Justice Black, speaking for a unanimous court, said:

> "The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." 361 U.S. at 217, 80 S.Ct. at 273.

In the later *Russell* case, the Court recognized the precedential validity of both *Bain* and *Stirone* in holding that an indictment must contain an averment identifying the subject under inquiry. The Court held that the indictment in the *Russell* case did not sufficiently apprise the defendant "of what he must be prepared to meet." This opinion contains an interesting recitation of the background for our constitutional provisions which afford protection for the accused, tracing the development of the common law, going back to the Assize of Clarendon in 1166. It points out that for many years the federal courts were guided solely by the common law and that it was not until the statute of 1872 (Rev.Stat. § 1025, 18 U.S.C. § 556 [1940 ed.]) that this country drifted away from the earlier technical and more formal pleading. This statute was subsequently repealed, but its substance is now contained in Fed.R.Crim.P. 52(a) and in Fed.R.Crim.P. 7(c).[2]

■ We have no difficulty in holding that the amendment correcting the time of the offense in the indictment did not in any manner deprive defendant of his Fifth and Sixth Amendment rights. He was indicted by a grand jury for the transportation of a stolen Cessna aircraft in interstate commerce from Sarasota, Florida to Dubuque, Iowa, knowing the same had been stolen, and was tried for

---

2. Fed.R.Crim.P. 52(a) provides:
    "(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."
    Fed.R.Crim.P. 7(c) provides:

"(c) Nature and Contents. The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * * "

that offense. The date is not an essential element of the crime and the changing thereof did no more than correct a typographical error and in no wise impeded the defendant in the apprisal of the nature and charge of the accusation. The indictment precisely described the illegal interstate transportation of a "red and white Cessna 172 airplane," knowing the same to have been stolen. Thus, defendant was provided with a precise description of the charge against him which enabled him to make a defense and sufficed to avail him of the judgment thereon as protection against a further prosecution for the same cause. The fact that he was arrested on July 15, 1967 and was in custody on July 21 is conclusive proof that he did not and could not have committed the offense on July 21, and this would be a bar to any attempted prosecution for the same offense on that date. Defendant was at all times fully aware of the actual date of the commission of the alleged wrongful act and could not have been prejudiced in any substantial rights by the amendment, since the mere correction of the date did not in any manner broaden the charge.

■ Time is not of the essence in connection with the charge for this crime, and the date in an indictment such as this was not a material allegation inasmuch as the time of the theft is not descriptive of the offense and need not be precisely proven other than to prove it occurred within the limitation period. This more modern rule has long existed in the federal courts. See and compare Dean Rubber Mfg. Co. v. United States, 356 F.2d 161, 168 (8th Cir. 1966); Huffman v. Sigler, 352 F.2d 370 (8th Cir. 1965); Whiteside v. United States, 346 F.2d 500 (8th Cir. 1965); Vincent v. United States, 337 F.2d 891 (8th Cir. 1964); Brilliant v. United States, 297 F.2d 385, 390 (8th Cir. 1962), cert. denied, 369 U.S. 871, 82 S.Ct. 1140, 8 L.Ed.2d 275 (1962); Alexander v. United States, 271 F.2d 140 (8th Cir. 1959); Berg v. United States, 176 F.2d 122, 126 (9th Cir. 1949), cert. denied, 338 U.S. 876, 70 S.Ct. 137, 94 L.Ed. 537 (1949);

Hale v. United States, 149 F.2d 401, 403 (5th Cir. 1945), cert. denied, 326 U.S. 732, 66 S.Ct. 40, 90 L.Ed. 436 (1945).

■ By reason of our constitutional provisions, an indictment cannot be amended in a substantial material way so as to broaden or change the charge or to prejudice an accused by failing to fully apprise him of the charge against him, but it would be wholly impractical and not required by any rule of law to vitiate this indictment by reason of the correction of a clerical error that was not of the essence in connection with the charge of the commission of the crime. From the cases cited, it appears that this variance between the indictment and the proof would not have been fatal had the indictment not been amended, and that there is valid authority to the effect that the defendant might have been tried on the original indictment with the erroneous date. In Gregory v. United States, 364 F.2d 210, 213 (10th Cir. 1966), cert. denied, 385 U.S. 962, 87 S.Ct. 405, 17 L.Ed.2d 307 (1966), which involved a variance in the complaint and the indictment with regard to the date of the commission of the alleged offense, the court said in affirming the conviction:

"The fourth objection directs itself to whether a fatal variance exists because the complaint alleges August 17, 1965 as the date of the offense and the indictment alleges August 27, 1965 as the date. Rule 7(c), Federal Rules of Criminal Procedure, indicates that errors or omissions shall not be grounds for reversal unless the defendant has been misled to his prejudice.

"Generally, a well-founded fatal variance objection is based upon a date which occurred after the indictment has been returned or so far before the date of the indictment as to clearly indicate the availability of a limitations defense in the cause. The appellant having offered no evidence in defense of the charge, it is difficult to determine how he could have been prejudiced."

The indictment in the case before us was returned August 9, 1967, and, therefore, neither of the conditions enumerated in the Gregory case as providing a basis for a well-founded fatal variance objection is present here. Nevertheless, we think it better under the facts here for the court to have corrected this clerical error by amendment, as was done. The correction thereof was not prejudicial to defendant and the trial court did not err in making such correction.

*The Instructions.*

Defendant assigns as error the court's refusal to give his proffered instruction No. 3, as follows:

"If you find that defendant did not intend to deprive J&J Aircraft of its rights and benefits of ownership but intended to return the aircraft to J&J Aircraft, the aircraft was not stolen and you shall find the defendant not guilty."

■ Defendant's contention is that this instruction was based on his theory of defense, and he cites authorities which hold that a defendant is entitled to an instruction on his theory of the case. While we agree with the authorities cited, we think the instruction here misconceives the law and is misleading and incomplete within the context of the existing factual situation here. Even if it might be said to be abstractly correct, the instruction could well have been confusing to the jury. Defendant admitted in his testimony that he originally obtained the plane on June 21, 1967 by false pretense. He testified: "I told them that another couple and myself were going to fly down to Key West and take some pictures. I wanted it until noon. I said from seven o'clock to noon." Admittedly, he intended to transport the plane in interstate commerce, and the minute he crossed the line with it, having obtained it with dishonest intent, he violated the Dyer Act. There was a conflict in defendant's testimony and other testimony concerning telephone calls to the company, but even under defendant's testimony he was guilty of keeping the plane beyond the period of time authorized. He would excuse himself by his telephone call to the company later that day, requesting to keep the plane until late that night or the following day, and by other telephone conversations which he allegedly had with employees of J&J Aircraft. He testified that the next day, which was June 22, he called from Birmingham requesting additional time and that he was advised by the party to whom he was talking that the plane was booked for Saturday, but that he would see what arrangements could be made and for him to call back the next day. When he called back on the 23rd, he testified that he was told that he could keep the plane a week. He admitted that he indicated in these calls that he was still in the State of Florida, even though, as he had originally intended, he had transported the plane to Birmingham, Alabama, and had attempted to fly Lieutenant Jacobson from Birmingham to his base in Texas, but the plane developed electrical trouble and he returned to Birmingham. Lieutenant Jacobson later took a commercial flight to Texas.

After the plane was repaired, Stewart flew to St. Louis, Missouri where he stayed several days, thence to Kansas City where he stayed several days, then to Iowa where he stopped over briefly in a couple of towns because of unfavorable weather conditions, before reaching Dubuque, Iowa. He also stayed in Dubuque several days prior to his arrest there on July 15, 1967. He used a credit card for fuel for the plane which was issued in another name, and registered at the Holiday Inn in Dubuque under the name "Bob Stratton." According to his testimony, his original plan was to fly from Dubuque to York, Pennsylvania where he could get some money to pay for the plane rental, but he expressed some intention of going to Canada.

■ There is no evidence on his part whatsoever that he was doing other than keeping the plane without the owner's permission, at least for the last week or

two of his unlawful possession thereof. Defendant was knowledgeable of the penalties of the Dyer Act, having admittedly been convicted on pleas of guilty to five felonies, one for interstate transportation of forged securities and another for a Dyer Act violation involving an automobile. He served a period of eight years for these previous crimes. A warrant for his arrest had already been issued in Florida prior to his apprehension, and what he might have intended to do with respect to the plane is certainly of no consequence since he had no right to transport it in interstate commerce at all under the circumstances upon which he obtained it, and he likewise incurred the penalties of the statute by keeping it beyond any time he claimed to have had permission, irrespective of his ultimate intention. So, in the light of his own testimony, the proffered instruction could well have been misleading and confusing to the jury, and certainly was incomplete.

The interpretation of the Dyer Act has resulted in numerous decisions involving its reach, the definition of its terms, and, as a matter of fact, the definition of nearly every word contained therein. These decisions evidenced a divergence of views in the various circuit courts, which resulted in the granting of certiorari by the Supreme Court in the case of United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957), which involved an alleged violation of the Dyer Act. In interpreting the term "stolen" as used in the statute, the Supreme Court there reviewed the legislative history of the Act and, noting the divergent decisions in the lower federal courts, held:

"We conclude that the Act requires an interpretation of 'stolen' which does not limit it to situations which at common law would be considered larceny. The refinements of that crime are not related to the primary congressional purpose of eliminating the interstate traffic in unlawfully obtained motor vehicles. The Government's interpretation is neither unclear nor vague.

'Stolen' as used in 18 U.S.C. § 2312 includes all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." 352 U.S. at 417, 77 S.Ct. at 402.

Following this decision of the Supreme Court, this court had occasion in the case of Schwab v. United States, 327 F.2d 11 (8th Cir. 1964), to interpret *Turley*. This court interpreted *Turley* as standing for the precedential conclusion that the statute may be satisfied with something less than permanency and something less than a deprival of the totality of ownership. Judge Blackmun, speaking for the court in *Schwab,* noted our cases as well as cases of other circuits following *Turley,* and said:

"The decision in *Turley* has been uniformly recognized as a broad, not a narrow, approach to the statute. Its language which we have quoted does not say 'all' the rights and benefits of ownership and it does not say that there must be an intent to deprive the owner of those rights for all time. The breadth of the *Turley* precedent demands a conclusion that the statute may be satisfied with something less than permanency and something less than a deprival of the totality of ownership." 327 F.2d at 13.

A close reading of *Turley* and *Schwab,* in the context of the undisputed facts in this case, makes it obvious that defendant's proffered instruction No. 3 was not complete and, further, that it was misleading because, admittedly, at the time of defendant's arrest he was keeping the plane without the owner's consent and, under settled law, he was guilty of violation of the Act, regardless of his intention to ultimately return the aircraft to its owner. The jury could have construed this instruction to mean that defendant could have kept the plane for years and still have been innocent of the crime with which he was charged if he ultimately intended to return it. In this respect, the instruction is incorrect.

As stated by the court in United States v. Kelly, 349 F.2d 720, 759 (2nd Cir. 1965), "If a proffered request is in any respect incorrect, the denial of such a request is not error. (Citing cases.)"

This court said in Cherry v. Stedman, 259 F.2d 774, 777–778 (8th Cir. 1958):

"A party cannot claim error in the refusal to give a requested instruction which is not entirely correct, or which is not possible to give without qualification, or which is so framed as to be capable of being misunderstood. (Citing cases.)"

The above language was quoted with approval in United States v. Lease, 346 F.2d 696, 702 (2nd Cir. 1965). The court there noted that this rule is "well settled."

Furthermore, the court in the instant case gave a proper instruction defining "stolen" in its instruction No. 9:

"The word 'stolen' as used in the crime of interstate transportation of stolen vehicles includes all felonious takings of vehicles with the intent to deprive the owner of the rights and benefits of ownership. It is not necessary that the taking of the vehicle be unlawful. Even if possession of the vehicle is lawfully acquired, the vehicle will be deemed 'stolen' if the defendant thereafter forms the intent to deprive the owner of the rights and benefits of ownership, and converts the vehicle to his own use."

We, therefore, hold that there was no error committed in the court's refusal to give defendant's requested instruction No. 3.

■ Defendant also contends that the court's instruction No. 6A was preju-

dicially erroneous in that it told the jury that the essential elements required to be proven to establish the offense are (1) "interstate transportation of an aircraft" and (2) "knowing the same to be stolen." Defendant's contention is that this instruction omitted one element of proof of the crime—the proof that the airplane was stolen. It is pointed out that in Dixon v. United States, 295 F.2d 396 (8th Cir. 1961), we stated that the Government must establish three essential elements: (1) that the vehicle was stolen, (2) that defendant transported it in interstate commerce, and (3) that defendant knew the vehicle had been stolen. We did make such a statement in *Dixon*, but are of the view that the instruction as given by Judge McManus made the same requirements, but by utilizing different language. He merely paraphrased the statute. An accused cannot transport a vehicle "knowing the same to have been stolen," if in fact it has not been stolen. Therefore, from a practical standpoint, the difference in characterizing the elements is one of semantics and not one of substance. It is interesting to note that the commentator in 56 A.L.R.2d, 1315–1324, in an annotation on the National Motor Vehicle Theft Act (Dyer Act), twice referred to the essential elements as being four in number.[3]

The trial court here, as we have already pointed out, gave a separate and correct instruction on the definition of "stolen" in its instruction No. 9, and, additionally, in instructions Nos. 7 and 8, it carefully defined the meaning of the term "interstate commerce" and the word "knowing."

3. The trial judge commented as follows when this question arose in chambers: "As to the elements, gentlemen, I know that frequently they are stated as three but you have to prove it stolen. In other words, one of the elements is the existence of a stolen aircraft. I feel it is implicit in element No. 2. The statute reads, 'Whoever transports in interstate commerce a motor vehicle or aircraft knowing the same to have been stolen.' It doesn't say whoever transports in interstate commerce a stolen aircraft knowing the same to have been stolen. The language is—if you would turn to that statement of the statute, and this is the reason I do not leave that as a separate element because it is not in the statute. It is in the statute in accordance with the language that I have used."

We conclude that the giving of instruction No. 6A did not constitute prejudicial error and are of the view that, in light of the other instructions given, it could not have misled the jury to the defendant's prejudice.

■ Other attacks are made upon the court's charge. We have carefully considered each and find them without merit. Therefore, we will discuss them only briefly. One of defendant's proffered instructions which the court refused to give was on the matter of intent, but this subject was adequately covered by other instructions which the court gave. Another claim of error relates to the court's instruction No. 10, but no objection was made to the giving thereof as required by Fed.R.Crim.P. 30. Still another claim that the court erred relates to the court's charge that "knowledge may be proved by defendant's conduct and by all the facts and circumstances surrounding the case." This latter is a stock instruction and the language used therein was lifted from the Manual on Jury Instructions—Criminal, appearing in 33 F.R.D. 523, 553, § 4.05.

It is our conclusion that the jury was fully and fairly instructed in a fashion that protected defendant's every right.

*Defendant's Motion for Discovery and Inspection of the Testimony of the Grand Jury Witnesses.*

■ This assignment of error is based on the opinion of the Supreme Court in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), but the defendant has advanced no basis or reason for the production and inspection of this testimony and does not even argue that the same was necessary or could have been useful. He does not assert that any prejudice resulted or could have resulted from the court's denial of this motion. Such was not the case in *Dennis,* where the Supreme Court said at pages 871–872, 86 S.Ct. at page 1850:

"Certainly in the context of the present case * * * it cannot fairly be said that the defense has failed to make out a 'particularized need.' The showing made by petitioners, both in the trial court and here, goes substantially beyond the minimum required by Rule 6(e) and the prior decisions of this Court."

The *Dennis* opinion continues with an enumeration of circumstances completely lacking in the instant case, e. g., the Court there observes that "certainly, there was reason to assay the latter testimony, some of which is 15 years after the event, against the much fresher testimony before the grand jury."

In the instant case, a full and extensive preliminary hearing was held on July 25, 1967. The names of the Government witnesses were there divulged, as well as the Government's basis for prosecution. Only six witnesses appeared before the grand jury. Two of these witnesses—one an employee of the Holiday Inn and another an employee of the airport, both of Kansas City—were not called as witnesses at the trial. Three of the remaining witnesses were friends of the defendant—one was his girl friend in Dubuque, Iowa and the others were Lieutenant Jacobson and a Mr. Burkhead. The only other witness was a Mr. Bell of J&J Aircraft whose testimony equated with other testimony at the preliminary hearing. The trial was not commenced until August 23, 1967, and, consequently, for a period of approximately a month before trial defendant had been fully apprised of the Government's case, which gave him ample time in which to prepare his defense, and yet the trial was held at a time close enough to the preliminary hearing for the facts to be fresh in the minds of all concerned.

We recently had occasion to interpret *Dennis* in National Dairy Products Corp. v. United States, 384 F.2d 457 (8th Cir. 1967). This court, speaking through Judge Matthes, said at page 461: "We believe a showing of 'particularized need' under the *Dennis* standards is still required."

Defendant here made his motion prior to trial and did not renew it at trial.

No "particularized need" was shown, and under the circumstances it appears obvious that no need existed or that any prejudice could flow from the court's refusal to grant defendant's motion.

█ The Government made a strong case for conviction, and the defendant made it even stronger by voluntarily taking the stand and making such damaging admissions as would seem to bind the jury to convict him. Defendant's theory under the facts here that his conduct was lawful, just so long as he intended to ultimately return the airplane to its rightful owner, was erroneous, and the evidence was amply sufficient to support the jury's verdict.

The judgment of conviction is affirmed.